STEVEN G. KALAR
Federal Public Defender
Northern District of California
SEVERA KEITH
Assistant Federal Public Defender
55 South Market Street, Suite 820
San Jose, CA 95113
Telephone:	(408) 291-7753
Facsimile:	(408) 291-7399
Email:	Severa_Keith@fd.org

Counsel for Defendant GARRETT

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>      v.<br><br>ROCCI GARRETT,<br><br>            Defendant. | Case No. CR 17–00487 BLF<br><br>**MOTION FOR COMPASSIONATE RELEASE** |

## INTRODUCTION

Rocci Garrett is a 38-year-old African-American man who suffers from a cardiac arrhythmia, asthma, and obesity.  He has been in federal custody since July 18, 2019, and has an estimated release date of May 7, 2026.  Because of his serious medical conditions and socioeconomic characteristics, Mr. Garrett is at high risk to contract a severe, and possibly deadly, case of COVID-19.  This risk is increased by the fact that he is imprisoned at Lompoc, a facility whose documented failure to effectively prevent and treat COVID-19 has resulted in hundreds of inmates and dozens of staff members contracting the virus.  Mr. Garrett has been a model citizen in prison, and he has a home and health plan waiting for him.  For all of these reasons, he respectfully moves this Court pursuant to 18 U.S.C. § 3582(c)(1) for an order reducing his sentence to time served and releasing him from FCI

Lompoc.

## FACTUAL AND PROCEDURAL HISTORY

### I.  The Offense and Conviction

An Indictment was filed against Rocci Garrett on September 14, 2017, alleging violations of conspiracy to import controlled substances, 21 U.S.C §§ 963, 952(a), and 960 and importation of controlled substances, 21 U.S.C §§ sections 952 and 950 and 18 U.S.C. § 2.  The Indictment alleged that Mr. Garrett conspired to import MDMA ("ecstasy") into the United States from France and Germany.  Mr. Garrett's role in the conspiracy was to rent mailboxes at private mailbox stores, and to retrieve the contraband as directed.  On November 19, 2019, Mr. Garrett accepted responsibility and plead guilty to both counts of the Indictment.  As a result of his plea, on November 19, 2019, he was sentenced to 96 months imprisonment on each count, to run concurrently, and to three years of supervised release.

### II.  Mr. Garrett's Chronic Medical Conditions

Mr. Garrett suffers from medical conditions that put him at unusually high risk for contracting a severe, or even fatal, case of COVID-19.  On July 20, 2020, an ECG revealed a cardiac arrhythmia.  *See* BOP Records, attached hereto as Ex. A, at 4, 55, 57.  An arrhythmia is a "change from the normal sequence of electrical impulses."  *See* American Heart Assn.*, About Arrhythmia*, https://www.heart.org/en/health-topics/arrhythmia/about-arrhythmia.  "When the heart doesn't beat properly, it can't pump blood effectively.  When the heart doesn't pump blood effectively, the lungs, brain, and all other organs can't work properly and may shut down or be damaged."  *Id.*  Heart arrhythmia can also be a symptom of cardiomyopathy (disease of the heart muscle).  *See* American Heart Assn., *What Is Cardiomyopathy in Adults*, https://www.heart.org/en/health-topics/cardiomyopathy/what-is-cardiomyopathy-in-adults.  According to the Centers for Disease Control (CDC), cardiomyopathies increase the risk of severe illness from COVID-19.  *See* CDC, *People at Increased Risk* (hereinafter *"Increased Risk"*), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  He undiagnosed has chest pain.  *Id.* at 3-5.

Mr. Garrett also has asthma, *see* BOP Records at 5, 9, 44, which the CDC has determined "increases your risk of severe illness from COVID-19," *see Increased Risk*, *supra*. While at Lompoc, he has sought treatment for asthma. *See Id.* Although he was initially prescribed an inhaler, the prescription was later discontinued due to what his medical records describe as an "adverse drug reaction." *See id.* at 1. According to the CDC, people with moderate to severe asthma may be at increased risk for severe illness from COVID-19. *See Increased Risk, supra*.

Asthma is a chronic disease in which the airways into and out of the lungs are inflamed. *See* American Academy of Allergy Asthma & Immunology, *Asthma Definition*, available at https://www.aaaai.org/conditions-and-treatments/conditions-dictionary/asthma. Symptoms include "wheezing, coughing, chest tightness and trouble breathing – especially early in the morning or at night. In a severe asthma attack, the airways close so much that other vital organs in the body do not get enough oxygen." *Id.* According to the CDC, people with moderate-to-severe asthma can have an increased risk of contracting a severe case of COVID-19. *See* CDC, *People at Increased Risk for Severe Illness* (hereinafter "*Increased Risk*"), http://www.cdc/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. A person has "moderate persistent asthma" if any of the following are present *before treatment*: daily symptoms, symptoms that interfere with daily activities, nighttime symptoms more than once per week, or abnormal lung function tests. *See* University of Michigan, *Classification of Asthma,* available at https://www.uofmhealth.org/health-library/hw161158. A person has "severe persistent asthma" if, *without treatment,* any of these symptoms occur throughout each day or severely limit daily physical activities. *See id.*

Mr. Garrett's moderate-to-severe asthma is documented in his BOP medical records. *See* BOP Medical Records at 1, 5, 9, 10, 44. BOP doctors determined that Mr. Garrett's asthma symptoms were severe enough to require an albuterol inhaler, to be used up to four times daily, as needed. *See id.* at 44. His asthma diagnosis is confirmed by his mother, who raised Mr. Garrett, and has a clear memory of the diagnosis. She reports a history of asthma in the family. *See* Ex. B, Decl. of S. Garrett.

Mr. Garrett's weight is also a risk factor. According to the CDC, obesity (BMI of 30 or higher) increases the risk of severe illness from COVID-19, and even being significantly overweight (BMI between 25 and 29) "might increase your risk of severe illness from COVID-19." *See Increased Risk*,

*supra.* When Mr. Garrett arrived at Lompoc, he was 6'1" tall and weighed 223 pounds. *See* BOP Records at 36. This puts his BMI at 31.1, indicating obesity and increased risk of severe illness from COVID-19. *See* BMI Calculator, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm. As such, he is considered obese and at a very high risk of severe illness from COVID.

In addition, Mr. Garrett has also experienced serious medical problems in custody that reflect Lompoc's failure to provide sanitary living conditions and appropriate medical care. He has contracted staph infections and cellulitis, a "potentially serious bacterial skin infection" that, if left untreated, "can spread to your lymph nodes and bloodstream and rapidly become life-threatening." *See* Mayo Clinic, *Cellulitis*, https://www.mayoclinic.org/diseases-conditions/cellulitis/symptoms-causes/syc-20370762; *see also* BOP Records at 7, 8, 41. According to the CDC, "[g]ood wound care and hygiene are important for preventing cellulitis." CDC, *Cellulitis: All You Need to Know*, https://www.cdc.gov/groupastrep/diseases-public/cellulitis.html.

### III. FCI Lompoc's Inadequate Response to the COVID-19 Pandemic

On September 25, 2020, court-appointed expert epidemiologist Homer Venters, MD, submitted a report regarding his inspection of BOP Lompoc in connection with *Torres, et al., v. Mulusnic, et al.,* No. 20-cv-04450-CBM (C.D. Cal.), a class action law suit against the prison. *See* COVID-19 Inspection of BOP Lompoc by Dr. Homer Venters ("Venters Rpt."), attached hereto as Ex. C. As Dr. Venters noted, "[t]he COVID-19 outbreak at BOP Lompoc has been one of the nation's most overwhelming." *Id.* at 2. As of September 1, 2020, nearly half the Lompoc population had been infected with COVID-19, and four people had died. *Id.* Although the facility claimed that most of these individuals had "recovered," Dr. Venters found that Lompoc's identification and treatment of these individuals was disturbingly inadequate. For example, he noted that approximately ¼ of the "recovered" individuals with whom he spoke at FCI Lompoc "were still experiencing symptoms of COVID-19, including shortness of breath, pain with breathing, daily headaches, ringing in the ears and weakness." *Id.* at 8. Distressingly, "[n]one of them reported being seen after leaving medical isolation to be asked about ongoing COVID-19 symptoms or disability," even though "[m]ost of those who reported ongoing symptoms of COVID-19 stated that they had submitted multiple sick call requests without eliciting any response." *Id.* at 8-9. The lack of medical attention was particularly worrisome

for inmates whose pre-existing medical conditions put them at high risk. Dr. Venters found that "[m]any patients with chronic health problems, including hypertension, diabetes and asthma reported that they went many months, often more than 6, without being seen in the chronic care clinic." *Id.* at 9. Overall, Dr. Venters identified four areas in which Lompoc's response to the pandemic has been deficient: (1) "[S]creening deficiencies [that] increase the risk that patients will become seriously ill or die from COVID-19 and also increase the potential spread of the virus"; (2) "Lack of timely access to sick call and chronic care"; (3) "Lack of infection control in housing areas"; and (4) "Punitive approach to quarantine." *See id.* at 21-25.

## ARGUMENT

When Congress enacted the First Step Act (FSA) in 2018, it expanded a sentencing court's authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). Under the FSA, "a district judge has the ability to grant a prisoner's motion for compassionate release even in the face of BOP opposition." *United States v. Young*, 2020 WL 1047815, *5 (M.D. Tenn. Mar. 4, 2020). "[F]ederal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction." *Id.* at *6; *see also United States v. McCarthy*, 2020 WL 1698732, *4 (D. Conn. Apr. 8, 2020) (noting that the amended § 3583 "allow[s] prisoners to directly petition courts for compassionate release and removes the BOP's exclusive gatekeeper role").

Before moving for compassionate release in district court, a defendant must seek relief directly from the BOP. *See* 18 U.S.C. § 3582(c)(1)(A). Once the defendant has exhausted his administrative remedies, he may move the court for a sentence reduction. *Id.*

When ruling on a motion for compassionate release, the district court considers any applicable § 3553(a) factors, as well as any "applicable policy statements issued by the Sentencing Commission." *Id.* Prior to the enactment of the FSA, the Sentencing Commission identified several "extraordinary and compelling reasons" for granting compassionate release. *See* USSG § 1B1.13(1)(A). It should be noted, however, that the Second, Sixth, and Seventh Circuits all have recently held that, because § 1B1.13 has not been amended since the FSA was enacted, "the Guidelines Manual lacks an 'applicable' policy statement covering prisoner-initiated applications for compassionate release."

MOTION FOR COMPASSIONATE RELEASE
*GARRETT*, CR 17–00487 BLF

*United States v. Gunn,* No. 20-1959, 2020 WL 6813995, *2 (7th Cir. Nov. 20, 2020); *see also United States v. Brooker,* 976 F.3d 228 (2d Cir. 2020); *United States v. Jones,* No. 20-3701 (6th Cir. Nov. 20, 2020). At most, "[t]he substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Applicable Notes provide a working definition of 'extraordinary and compelling reasons.'" *Gunn,* 2020 WL 6813995 at *2; *see also United States v. McCarthy*, 2020 WL 1698732, *4 (D. Conn. Apr. 8, 2020) ("[T]he old policy statement provides helpful guidance, but does not constrain a court's independent assessment of whether extraordinary and compelling reasons warrant a sentence reduction.").

One of the "extraordinary and compelling reasons" for granting compassionate release identified by the Sentencing Commission is that the defendant is "suffering from a serious physical or medical condition ... that substantially diminishes the ability of the defendant to provide self-care within the environment and from which he or she is not expected to recover." USSG § 1B1.13(1)(A), comment. (n.1(A)(ii)). In addition, a particular case may present "an extraordinary and compelling reason other than, or in combination with," the reasons that the Commission has identified. *Id.*, comment. (n.1(D)).

The combination of Mr. Garrett's chronic health conditions and the increased risk inherent in being confined in a penal institution where efforts to contain the virus have failed, are extraordinary and compelling reasons justifying compassionate release.

### I.     This Court Has Jurisdiction to Consider Mr. Garrett's Request

Mr. Garrett requested a reduction in sentence/compassionate release from the warden of FCI Lompoc on July 14, 2020. *See* Ex. D, attached hereto. The warden denied his request in writing on August 17, 2020. *See* Ex. E, attached hereto. Accordingly, the exhaustion requirement has been met.

### II.    Mr. Garrett's Chronic Medical Conditions Are "Extraordinary and Compelling" Reasons for Release

The ongoing COVID-19 pandemic is "extraordinary and unprecedented in modern times in this nation." *United States v. Burrill*, 2020 WL 1846788, *2 (N.D. Cal. Apr. 10, 2020) (citation omitted). Although "the COVID-19 pandemic is devastating in every region it invades, prison populations are subject to heightened vulnerability." *Miller v. United States*, 2020 WL 1814084, *3 (E.D. Mich. Apr. 9, 2020) (citations omitted).

Even in the best of circumstances, "[p]rison settings present unique challenges in preventing the spread of infectious diseases." *Schafer*, 2020 WL 2519726 at *4 (citations omitted). People in prison share bathrooms, sinks, and showers. They eat and sleep in close proximity to each other. They often lack basic hygiene items, much less the ability to regularly disinfect their living quarters. In short, "[t]he conditions and reality of incarceration makes prisons and jails tinderboxes for the spread of disease." Kimberly Kindy, "An Explosion of Coronavirus Cases Cripples Federal Prison in Louisiana," *Washington Post*, Mar. 29, 2020, https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html.

The risks are "particularly acute when dealing with COVID-19." *Schafer*, 2020 WL 2519726 at *4. "With no known effective treatment, and vaccines months (or more) away, public health officials have been left to urge the public to practice 'social distancing,' frequent (and thorough) handwashing, and avoidance of close contact with others ... – all of which are extremely difficult to implement in a detention facility." *United States v. Martin*, 2020 WL 1274857, *2 (D. Md. Mar. 17, 2020). The COVID-19 case rate for prisoners is 5.5 times higher than the rate in the general population. *See* Saloner, et al., "COVID-19 Cases and Deaths in Federal and State Prisons," JAMA, July 8, 2020, https://jamanetwork.com/journals/jama/fullarticle/278249. Not surprisingly, "[t]he Centers for Disease Control ('CDC') have warned COVID-19 poses a heightened risk to those incarcerated in jails and prisons." *Burrill*, 2020 WL 1846788 at *2 (citation omitted).

As of the date of this motion, there is a severe outbreak of COVID-19 at Lompoc USP. *See* https://santamariatimes.com/news/local/crime-and-courts/covid-19-outbreak-infects-48-inmates-11-staff-at-lompoc-prison-complex/article_f1ccc0e7-ab28-5e3a-befa-a9a4ade45666.html. In total, more than 900 inmates and staff have tested positive for the virus, and five inmates have died of COVID-19 at Lompoc. *See* bop.gov/coronavirus. Arguably, the COVID-19 pandemic, in and of itself, is an "extraordinary reason" to grant a motion for compassionate release. But Mr. Garrett is not simply raising "general concerns about possible exposure to COVID-19." *United States v. Eberhart*, 2020 WL 1450745, *2 (N.D. Cal. Mar. 25, 2020). His request stems from the fact that he is "suffering from a serious physical or medical condition ... that substantially diminishes [his] ability ... to provide self-

care within the environment of a correctional facility and from which he ... is not expected to recover." USSG § 1B1.13, comment. (n.1(A)(ii)).  "For prisoners with preexisting conditions, COVID-19 is too often fatal." *Doshi*, 2020 WL 2556794 at *2.  Mr. Garrett has a heart arrhythmia and asthma, and "there is evidence that COVID-19's deadliest effects occur in the cardiovascular system, not just the lungs." *United States v. Anderson*, – F. Supp. 3d –, 2020 WL 5982896, *5 (E.D. Wis. Oct. 8, 2020) (citations omitted).  And while Mr. Garrett is still in his late 30s, the CDC has reported that "patients in their 30s with underlying health problems – including heart disease/hypertension – more than five times likelier to be hospitalized ..., five times likelier to be admitted to an ICU ..., and **twenty-eight times likelier to die**" than people the same age without underlying conditions.  *United States v. Wylie*, – F. Supp. 3d –, 2020 WL 5569952, *5 (D. Neb. Sept. 17, 2020) (emphasis in original) (citations omitted).  He is also statistically at higher risk because of his race.  *See* Tiffany Ford, et al., "Race Gaps in COVID-19 Deaths Are Even Bigger Than They Appear," The Brookings Institute (June 16, 2020), https://www.brookings.edu/blog/up-front/2020/06/16/race-gaps-in-covid-19-deaths-are-even-bigger-than-they-appear/; *see also* CDC, *Racial and Ethnic Minority Groups*, https://cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html.  Several courts have taken this factor into consideration in deciding to grant compassionate release.  *See, e.g., United States v. Evans*, – F. Supp. 3d –, 2020 WL 3971620, *2 (N.D. Cal. July 14, 2020); *United States v. Thompson*, – F. Supp. 3d –, 2020 WL 3470300, *3 (C.D. Ill. June 24, 2020); *United States v. Lewis,* – F. Supp. 3d –, 2020 WL 5095471, *5 (W.D. Wash. Aug. 28, 2020).

### III. The § 3553(a) Factors Support Release

Mr. Garrett was originally sentenced to 96 months' imprisonment; however, the "balance weighs differently in the current circumstances" of the pandemic. *United States v. Gonzalez*, 2020 WL 2766048, *1 (S.D.N.Y. May 28, 2020; *see also United States v. Frew*, 2020 WL 6440484, *1 (N.D. Cal. Oct. 27, 2020) (granting compassionate release and noting that "conditions of confinement have been much harsher than anticipated at the time of sentencing due to the pandemic").  This is particularly true, where here, Mr. Garrett is housed in an institution that has not responded appropriately to the pandemic, does not appear to have taken measures recommended in the Ventner Report, and which is currently experiencing a second surge of infections.

None of this could have been anticipated when Mr. Garrett was sentenced. Not only has Mr. Garrett suffered from the squalid conditions at the prison, but also he has been imprisoned in particularly harsh conditions, which have included full lockdowns and "punitive" quarantine, which have included denial of cleaning supplies, no family contact, no legal contact, no access to medical or mental health care. Ex. F, September 23, 2020 Garrett Letter. Due to the recent spike in COVID-19 cases, Mr. Garrett is once again in lockdown, with no access to any services.

When the Court sentenced Mr. Garrett, he expected that he would participate in drug treatment programs, RDAP, as well as other rehabilitative programming and services. Due to the pandemic, no such programming available. As such, the need to provide Mr. Garrett with "educational or vocational training, medical care, or other correctional treatment," 18 U.S.C. § 3553(a)(2)(D), would be better served by releasing Mr. Garrett to live with his fiancée, with a requirement that he participate in a drug treatment program, employment, and other rehabilitative activities.

The need for the punishment to reflect the seriousness of the offense, promote respect for the law, and provide just punishment has been accomplished by virtue of the time Mr. Garrett has already served, especially considering the devastating conditions of confinement that he has suffered. *See* 18 U.S.C. § 3553(a)(2)(A). He has been in continuous federal custody for 1 ½ years. This equates to almost 20% of his sentence. Other Courts have granted compassionate release to similarly-situated inmates. *See United States v. Barber*, No. 6:18-CR-00446-AA, 2020 WL 2404679 (D. Or. May 12, 2020) (Granting release to a defendant housed at Lompoc, who pled to 841(a),(b), and 922(g), served 8 ½ months of a 60 month sentence, and suffered from severe obesity, hypertension, and diabetes, and who had already contracted COVID-19); *United States v. Foreman*, No. 3:19-cr-62 (VAB) 2020 WL 2315908 (D. Conn. May 11, 2020) (Granting compassionate release to a 58 year old defendant who pled tax evasion, served almost two months of a year-and-a-day sentence, and suffered from hypertension and obesity, finding that the combination of conditions made her vulnerable, even though none of them were particularly severe); *United States v. Fowler*, No. 17-CR-00412-VC-1, 2020 WL 3034714 (N.D. Cal. June 6, 2020) (Granting compassionate release to a defendant who pled to distribution of methamphetamine, served approximately one year of a sixty month sentence, and suffered from chronic asthma).

Finally, Mr. Garrett does not pose a danger to the community. He has been a model inmate with no disciplinary record, Ex. G, and importantly, he has been sober for a significant period of time. Any risk can be mitigated with conditions of supervised release, including living with his fiancée, who is stable and working, and who will require the same of him. Additionally, he will be required to participate in substance abuse and comply with other conditions of supervised release. Mr. Garrett has no violent crimes in his criminal history, and Probation recognized that his "convictions were in support of his severe substance abuse." PSR Sent. Rec. at 2. Intensive substance abuse treatment will mitigate any danger to the community. If he does not rehabilitate, Mr. Garrett will be facing "years of supervised release – limitations on his freedoms – during which he can be quickly returned to custody if he shows signs of likely recidivism." *United States v. McPherson*, 2020 WL 1862596, *5 (W.D. Wash. Apr. 14, 2020). He knows that if he violates the conditions of his supervised release, or is arrested, for any new criminal conduct, he will find himself back in prison.

## CONCLUSION

For the reasons set forth above, Mr. Garrett respectfully requests that the Court reduce his sentence to time served and convert the remainder to a term of supervised release.

Dated:   January 15, 2020

Respectfully submitted,
STEVEN G. KALAR
Federal Public Defender
Northern District of California

           /S
SEVERA KEITH
Assistant Federal Public Defender

MOTION FOR COMPASSIONATE RELEASE
*GARRETT*, CR 17–00487 BLF